**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DENIECE DRAKE, individually and on behalf of all others similarly situated, | x : : |
| Plaintiff, | : Case No. : |
| v. | : : |
| | : |
| BAYER CORPORATION, | : **DRAFT** |
| | : **CLASS ACTION COMPLAINT** |
| | : |
| Defendant. | : **JURY TRIAL DEMANDED** |
| | : : |
| | x |

Plaintiff, Deniece Drake (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by her attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      This action seeks to remedy the deceptive and misleading business practices of Bayer Corporation (hereinafter "Defendant") with respect to the marketing and sales of Defendant's One a Day Natural Fruit Bites products[1] that represent that they are natural ("Products").

2.      Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers, i.e., that its Products are natural; however, Defendant's advertising and marketing campaign is false, deceptive, and misleading because the Products contain non-natural, synthetic ingredients.

---

[1] The Products come in four varieties: Men's, Women's, Men's 50+, and Women's 50+. All make the "natural" claim.

3.     Plaintiff and those similarly situated ("Class Members") viewed Defendant's misrepresentations that the Products are natural when purchasing the Products. Plaintiff and Class Members paid a premium for the Products based upon their natural representation. Given that Plaintiff and Class Members paid a premium for the Products based on Defendant's misrepresentations that they are natural, Plaintiff and Class Members suffered an injury in the amount of the premium paid.

4.     Defendant's conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350. Accordingly, Plaintiff brings this action against Defendant on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

5.     Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in food, cleaning products, bath and beauty products and everyday household products.  Companies such as Defendant have capitalized on consumers' desire for purportedly "natural products."  Indeed, consumers are willing to pay, and have paid, a premium for products branded "natural" over products that contain synthetic ingredients.  In 2015, sales of natural products grew 9.5% to $180 billion.[2]  Reasonable consumers, including Plaintiff and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

---

[2] *Natural Products Industry Sales up 9.5% to $180bn Says NBJ,* FOOD NAVIGATOR, http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6; *see also*  Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www.investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025); *Natural living: The next frontier for growth? [NEXT Forecast 2017]*, NEW HOPE NTWORK (December 20, 2016), http://www.newhope.com/beauty-and-lifestyle/natural-living-next-frontier-growth-next-forecast-2017.

6.      Despite the Products containing a number of synthetic ingredients, Defendant markets

the Products as being natural.  Below are the Products' labeling at issue:

 

 

7.      Defendant's representations that the Products are natural, are false, misleading, and deceptive because all the Products contain the same ingredients that are, as explained below, synthetic.

a.  **Cholecalciferol** (9,10-seco(5Z,7E,)-5,7,10(19)-cholestatrien-3-ol) is a synthetic substance. It is manufactured by ultraviolet irradiation of 7-dehydrocholesterol produced from cholesterol. *See* 21 C.F.R. § 184.1950(a)(2). It is then purified by crystallization. *Id.*

b.  **Niacinamide** (3-pyridinecarboxylic acid amide)[3] is a synthetic substance. Niacinamide, as known as nicotinamide,[4] is manufactured in several ways, each of which is a chemical process that chemically changes substances into niacinamide:[5]

   i.   2-Methylglutaronitrile, a byproduct of adiponitrile production, is converted to 2-methyl-1,5-diaminopentane. Cyclic hydrogenation gives 3-methylpiperidine. Dehydrogenation yields 3-methylpyridine, which is then ammoxidated and partly hydrolyzed to nicotinamide;

   ii.  In a multitubular reactor 3-methylpyridine, air, ammonia, and hydrogen react at ca. 350 °C and moderate pressure to give 3-cyanopyridine. Heterogeneous catalysts containing oxides of antimony, vanadium, and titanium, antimony, vanadium, and uranium or antimony-vanadium-titanium catalyst are highly effective. For instance, with a vanadium, titanium, zirconium,

---

[3] *See* 21 C.F.R. § 184.1535.
[4] NAT'L CTR. FOR BIOTECHNOLOGY INFO., U.S. DEP'T OF HEALTH & HUMAN SERVS., *Open Chemistry Database: Nicotinamide: 4.2. Synonyms* PUBCHEM.NCBI.NLM.NIH.GOV .
[5] *Id.* at *10.2 Methods of Manufacture.*

molybdenum catalyst, a reactor temperature of 340 °C, and a molar feed ratio of 3-methylpyridine: ammonia: oxygen of 1:1.3:40 yields 95% of 3-cyanopyridine. 3-Cyanopyridine is converted to nicotinamide by alkaline hydrolysis. This reaction has the advantage that saponification to the amide is fast compared to total hydrolysis to nicotinic acid. The hydrolysis to the amide is normally carried out with catalytic amounts of bases, mainly sodium hydroxide, at 130-150 °C;

iii. In the Lonza process, 3-cyanopyridine is converted to nicotinamide by means of an immobilized microorganism of the genus Rhodococcus. Heterogeneous catalysts are also mentioned. A copper-chromium oxide catalyst, manganese dioxide, or manganese dioxide with chromium-nickel oxide, chromium-cobalt oxide, or manganese dioxide with titanium-silicon dioxide give good yields of nicotinamide; or

iv. Nicotinic acid is melted and reacted with ammonia gas to yield nicotinamide. The reaction is catalyzed by the presence of ammonium salts. After distillation, nicotinamide is dissolved in water, purified by the addition of activated carbon, filtered, recrystallized and centrifuged. The nicotinamide contained in the mother liquor is reclaimed by a special recovery operation. The wet pure nicotinamide filter cake is dried under vacuum in a rotary vacuum drier.

  c. **Pyridoxine hydrochloride** (3-hydroxy-4,5-dihydroxymethy-2-methylpyridine hydrochloride) is prepared by chemical synthesis[6], and is therefore synthetic substance. Pyridoxine hydrochloride is manufactured in several ways, each of which is a chemical process that chemically changes substances into pyridoxine hydrochloride:[7]

    i. Synthesis by condensation of cyanoacetamide & ethoxyacetylacetone;

    ii. Synthesis from 2-butanon-1,4-diol & alpha-methyliminopropionitrile; or

    iii. Synthesis from ethyl pyruvate, ethyl glycinate, and 1,4-diethoxy-2-butanone.

  d. **D-biotin** is a synthetic substance. Di-biotin, as known as biotin,[8] is manufactured in several ways, each of which is a chemical process that chemically changes substances into niacinamide:[9]

    i. The Hoffman-La Roche industrial synthesis of biotin starts with fumaric acid. The sequence of bromination, replacement of dibromide with benzyl-bromide, and ring closure with phosgene gives the imidazole cis-dicarboxylic acid. The corresponding anhydride is opened with cyclohexanol to the racemic monoester which is resolved with (+)-ephedrine in high yield. The enantiomer is recycled back to the anhydride. Lithium borohydride reduces only the ester group of

---

[6] 21 C.F.R. § 184.1676.
[7] NAT'L CTR. FOR BIOTECHNOLOGY INFO., U.S. DEP'T OF HEALTH & HUMAN SERVS., *Open Chemistry Database: Pyridoxine hydrochloride: 10.2 Methods of Manufacture* PUBCHEM.NCBI.NLM.NIH.GOV.
[8] NAT'L CTR. FOR BIOTECHNOLOGY INFO., U.S. DEP'T OF HEALTH & HUMAN SERVS., *Open Chemistry Database: Biotin: 2.4.2. Depositor-Supplied Synonyms* PUBCHEM.NCBI.NLM.NIH.GOV .
[9] *Id.* at *10.2 Methods of Manufacture.*

(+)-ephedrine, thus producing the lactone with the desired absolute configuration. Sulfur is then introduced by treatment with potassium thioacetate to give the thiolactone. The side chain is introduced in two phases. The first three carbons are attached by a Grignard reaction. Dehydration and hydrogenation over Raney nickel establishes the third chiral center stereospecifically. The last two carbons are then added by reaction of the cyclic sulfonium cation with sodium dimethylmalonate. Hydrolysis of the ester groups of decarboxylation, and didebenzylation occur during heating with aqueous HBr to produce the optically pure biotin in a more than 25% overall yield;

ii.    Sumitomo produces biotin by an efficient asymmetric conversion of the prochiral cis-acid to the optically active lactone. The acid reacts with the optically active dihydroxy amine to give quantitatively the chiral imide. Sodium borohydride reduces stereoselectively the pro-R carbonyl group to give, after recrystallization, the optically pure hydroxy amide. Hydrolysis then yields the lactone; or

iii.   The stereocontrolled formation of all chiral centers of biotin can be achieved in three syntheses by means of 1,3-dipolar nitrone-olefin cycloadditions and in two syntheses by (2+2) cycloaddition methods.

e. **Potassium iodide** is prepared by reacting hydriodic acid with potassium biocarbonate,[10] and is therefore a synthetic substance. Other methods of

---

[10] 21 C.F.R. § 184.1634.

manufacturing include a chemical process that chemically changes substances into

potassium iodide:[11]

i.      Prepared from HI and KHCO3. Purification by melting in

dry hydrogen ... Continuous electrolytic process for large scale

industrial preparation;

ii.      A hot aqueous solution of potassium hydroxide is treated

with iodine ... to form mixture of KI & potassium iodate. Solution is

concentrated by heating ... then an excess of powdered charcoal is

added ... Mixture is evaporated to dryness, then ignited. Charcoal ...

reduces iodate to iodide and all of the iodine is thus obtained as

potassium iodide;

iii.      Prepared by first forming ferrosoferric iodide through a reaction

between iron wire and iodine in the presence of water. A solution of

pure potassium carbonate ... added until the solution is faintly

alkaline, boiled for a few moments, and filtered; filtrate is

concentrated and set aside to crystallize. KI ... is crystallized from an

alkaline solution;

iv.      Most USA production involves the absorption of iodine in KOH.

Approximately 80 wt % of the potassium iodate ... crystallizes from

the reaction mixture and is separated for sale. Of the remainder, 90 wt

% is removed by evaporation, fusion, and heating to about 600 °C.

The iodate is a poison /and/ ... must be completely removed

---

[11] NAT'L CTR. FOR BIOTECHNOLOGY INFO., U.S. DEP'T OF HEALTH & HUMAN SERVS., *Open Chemistry Database: Potassium iodide: 10.2 Methods of Manufacture* PUBCHEM.NCBI.NLM.NIH.GOV.

frequently by a final reduction with carbon. After re-solution in water,

further purification is carried out before

recrystallization. Iron, barium, carbonate, and hydrogen sulfide are

used to affect the precipitation of sulfates and heavy metals; or

v.      Made by (1) Reaction of HI & KCl, followed by distillation of HCl,

(2) Reaction of iodine with KOH or K2CO3 in solution, (3) Reaction

of ferrous/ferric iodide with K2CO3, and (4) Evaporation of natural

brines.

8.      Whether Defendant's labeling of the Products as natural is deceptive is judged by whether it would deceive or mislead a reasonable person.  To assist in ascertaining what a reasonable consumer believes the term natural means, one can look to the regulatory agencies for their guidance.

9.      In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic (Natural).  In accordance with this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted from a natural source (i.e. naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e. a process whereby a substance is transformed into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter.

10.     Congress has defined "synthetic" to mean "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plants, animals, or mineral sources . . . ." 7 U.S.C. § 6502 (21).

11.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale. Consumers would not know the true nature of the ingredients merely by reading the ingredients label. This is because the ingredient list does not disclose the manufacturing process for each ingredient. As the citations in paragraph 7 make clear, it takes dedicated research of the scientific, manufacturing, and regulatory literature to ascertain the manufacturing process for each ingredient and thereby ascertain whether the ingredient is a synthetic substance.

12.     Discovering that the ingredients are not natural and are actually synthetic requires a scientific investigation and knowledge of chemistry beyond the everyday knowledge of the average consumer. This is why, even though the ingredients listed above are identified on the back of the Products' packaging in the ingredients list, the reasonable consumer would not understand – nor are they expected to understand - that these ingredients are synthetic.

13.     Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Defendant's prominent claims and representations that the Products are natural.

14.     Defendant did not disclose that the above-listed ingredients are synthetic ingredients. A reasonable consumer understands Defendant's natural claims to mean that the Products are natural and do not contain synthetic ingredients.

15.     Defendant has thus violated, *inter alia*,  New York General Business Law § 392-b by: a) putting upon an article of merchandise, bottle, wrapper, package, label or other thing, containing or covering such an article, or with which such an article is intended to be sold, or is sold, a false description or other indication of or respecting the kind of such article or any part thereof; and b) selling or offering for sale an article, which to its knowledge is falsely described or indicated upon

any such package, or vessel containing the same, or label thereupon, in any of the particulars specified.

16.    Consumers view the label representations and information before making purchasing decisions.

17.    The marketing of the Products as natural in a prominent location on the labels of all of the Products, throughout the Class Period, evidences Defendant's awareness that natural claims are material to consumers.

18.    Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

19.    Plaintiff and the Class members viewed Defendant's misleading representations and omissions.

20.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class members.

21.    In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled as being natural over comparable products not so labeled.

22.    As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and the Class members in that they:

    a.    Paid a sum of money for Products that were not what Defendant represented;

    b.    Paid a premium price for Products that were not what Defendant

represented;

c.      Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

d.      Ingested a substance that was of a different quality than what Defendant promised; and

e.      Were denied the benefit of the beneficial properties of the natural supplements Defendant promised.

23.    Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class members would not have been willing to pay the same amount for the Products they purchased.

24.    Plaintiff and the Class members paid for Products that are natural but received Products that are not natural.  The Products Plaintiff and the Class members received were worth less than the Products for which they paid.

25.    By way of example, Walgreens sells an eighty count of One-a-Day Women's Multivitamin Gummies for $11.99, or $0.80 per vitamin.[12] Simultaneously, Walgreens sells a sixty count of One-a-Day Women's Natural Fruit Bites Multivitamins for $14.99, or $0.25 per vitamin.[13]

26.    Plaintiff and the Class members all paid money for the Products; however, Plaintiff and the Class members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiff and the Class members purchased, purchased more of, and/or paid more for the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

---

[12] Walgreens, Women's Multivitamin Gummies, https://www.walgreens.com/store/c/one-a-day-vitacraves-women's--multivitamin-gummies-blue-raspberry,-cherry,-orange/ID=300416501-product (last visited May 30, 2023).
[13] Walgreens, Women's Natural Multivitamin Gummies, https://www.walgreens.com/store/c/one-a-day-women%C2%BFs-natural-fruit-bites-multivitamin-with-immune-health-support-apple/ID=300401793-product (last visited May 30, 2023).

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section 1332(d) in that: (1) this is a class action involving more than 100 class members; (2) Plaintiff is a citizen of the State of New York, Defendant Bayer Corporation is a citizen of the States of Indiana and New Jersey, and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

28.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of New York, contract to supply goods within the State of New York, and supply goods within the State of New York, including the Products.

29.     Venue is proper because a substantial part of the events or omissions giving rise to the classes' claims occurred in this District.

## PARTIES

### Plaintiff

30.     Plaintiff is an individual consumer who, at all times material hereto, was a citizen of New York State.  Plaintiff purchased the Women's version of the Products during the Class Period from retail locations in Queens, New York. The packaging of the Product Plaintiff purchased contained the representation that it was natural. Plaintiff believes that products that are labeled as natural do not contain synthetic ingredients. Plaintiff believes a synthetic ingredient is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources.

31.     Had Defendant not made the false, misleading, and deceptive representation that the Products were natural, Plaintiff would not have been willing to pay the same amount for the Products, and, consequently, would not have been willing to purchase the Products. Plaintiff purchased,

13

purchased more of and/or paid more for, the Products than she would have had she known the truth about the Products. The Product Plaintiff received was worth less than the Product for which she paid. Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

**Defendant**

31.     Defendant Bayer Corporation is a corporation with its principal place of business in Whippany, New Jersey.  Defendant manufactures, markets, advertises, and distributes the Products throughout the United States, including in the District. Defendant created and/or authorized the false, misleading and deceptive advertisements, packaging and labeling for the Products.

## CLASS ALLEGATIONS

32.     Plaintiff brings this matter on behalf of herself and those similarly situated.  As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and labeling practices. Defendant's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution.

33.     The Class is defined as all consumers who purchased the Products in New York during the Class Period (the "Class").

34.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

35.     Numerosity: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

36.     <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

      a.   Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

      b.   Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

      c.   Whether Defendant made false and/or misleading statements to the Class and the public concerning the contents of its Products;

      d.   Whether Defendant's false and misleading statements concerning its Products were likely to deceive the public; and

      e.   Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

37.     <u>Typicality</u>: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendant's Products.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

38.     <u>Adequacy</u>: Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the Class Members she seeks to represent, her consumer protection claims are common to all members of the Class and she has a strong interest in vindicating her rights, she has retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

39.   <u>Predominance</u>: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

40.   <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.   The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.   The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

c.   When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.   This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.   This class action will assure uniformity of decisions among Class Members;

g.   The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.   Class Members' interests in individually controlling the prosecution of separate actions are outweighed by their interest in efficient resolution by single class action; and

i.   It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by Defendant's uniform false advertising to purchase its Products as natural.

41.   Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

**FIRST CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 349**
**(On Behalf of Plaintiff and Class Members)**

42.   Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

43.   New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

44.   The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the Class Members seek monetary damages and the entry of preliminary against Defendant.

45.   Defendant misleadingly, inaccurately, and deceptively advertises and markets its Products to consumers.

46.     Defendant's improper consumer-oriented conduct—including labeling and advertising the Products as being natural —is misleading in a material way in that it, *inter alia*, induced Plaintiff and the Class Members to purchase and pay a premium for Defendant's Products and to use the Products when they otherwise would not have. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

47.     Plaintiff and the Class Members have been injured inasmuch as they paid a premium for products that were—contrary to Defendant's representations— not natural.  Accordingly, Plaintiff and the Class Members received less than what they bargained and/or paid for.

48.     Defendant's advertising and Products' packaging and labeling induced Plaintiff and the Class Members to buy Defendant's Products and to pay a premium price for them.

49.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the Class Members have been damaged thereby.

57.     As a result of Defendants' recurring deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, interest, and attorneys' fees and costs. This includes actual damages under GBL § 349, as well as statutory damages of $50 per unit purchased pursuant to GBL § 349.

**SECOND CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiff and the Class Members)**

58.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

59.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

60. N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

61. Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent that the Products are natural.

62. Plaintiff and the Class Members have been injured inasmuch as they viewed the labeling, packaging, and advertising and paid a premium for the Products which were—contrary to Defendant's representations—not natural. Accordingly, Plaintiff and the Class Members received less than what they bargained and/or paid for.

63. Defendant's advertising, packaging, and products' labeling induced Plaintiff and the Class Members to buy Defendant's Products.

64. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

65. Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

66. Defendant made the material misrepresentations described in this Complaint in Defendant's advertising and on the Products' packaging and labeling.

67.     Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

68.     As a result of Defendant's recurring acts and practices in violation of GBL § 350, Plaintiff and class members are entitled to monetary and compensatory damages, interest, and attorneys' fees and costs, as well as statutory damages of $500 per Product purchased.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, prays for judgment as follows:

(a) Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the FRCP;

(b) Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

(c) Awarding monetary damages and treble damages;

(d) Awarding statutory damages of $50 per transaction and treble damages for knowing and willful violations, pursuant to N.Y. GBL § 349;

(e) Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL § 350;

(f) Awarding punitive damages;

(g) Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and reimbursement of Plaintiff's expenses; and

(h) Granting such other and further relief as the Court may deem just and proper.

Dated: May 31, 2023

REESE LLP

*/s/ Charles D. Moore*
Charles D. Moore
100 South 5th Street, Suite 1900
Minneapolis, MN 55402
Telephone: 212-643-0500
Email: *cmoore@reesellp.com*

REESE LLP
Michael R. Reese, Esq.
Sue J. Nam, Esq.
Carlos F. Ramirez, Esq.
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

REESE LLP
George V. Granade
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070
Facsimile  (212) 253-4272
Email: *ggranade@reesellp.com*

*Counsel for Plaintiff and the Class*